**FIRST DIVISION
PHIPPS, C. J.,
ELLINGTON, P. J., and MCMILLIAN, J.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/**

**March 19, 2015**

# In the Court of Appeals of Georgia

A14A1981. STREETER v. STATE.

MᴄMɪʟʟɪᴀɴ, Judge.

Sandra Streeter was convicted by a jury of burglary, two counts of financial transaction card fraud, three counts of financial transaction card theft, and one count of attempt to commit financial transaction card fraud.[1] She appeals following the denial of her motion for new trial, arguing that her trial counsel was ineffective and that the evidence was insufficient to convict her of burglary and the financial transaction card fraud count which alleged that she used a BB&T Visa credit card ("BB&T card") at an AutoBuffs Express Car Wash ("AutoBuffs"). As more fully set forth below, we now affirm in part and reverse in part.

---

[1] Streeter was found not guilty of identity fraud.

Construed to support the jury's verdict,[2] the evidence presented at trial shows that on July 14, 2011, Primrose Schools Franchising Company ("Primrose") was conducting a curriculum training program for its employees and franchise owners (collectively referred to as "Primrose employees") at its corporate development headquarters located on Cedercrest Road in Acworth, Georgia. The training seminar had been in session for several days, and all the Primrose employees who worked in the building as well as numerous Primrose employees who worked at other locations were participating in the seminar. The Primrose corporate building contained both training rooms and employee offices, and the doors to the building were normally kept locked. Typically, Primrose employees who worked inside the building used a key code to open the doors to the building, and visitors were "buzzed" into the building by someone disengaging the locks from the inside. However, due to the large number of Primrose employees who were attending the seminar from other locations, the locks on the main doors had been disengaged on the day in question.

---

[2] *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

At that particular time, Jodi Sherman[3] was working as Primrose Professional Development Manager and had a private office on the main floor of the building. She was also one of the presenters at the seminar and was in and out of her office all day. As was her custom, her office door was unlocked throughout the day with her purse sitting on the floor; she testified that someone standing in the hallway could probably see it sitting there. However, none of the training classes were being held in that part of the building, and the seminar trainees should not have entered that area unless a Primrose corporate employee brought them there or they wandered off on their own.

Sherman testified that between 10:30 to 11:30 the morning of July 14, she was in the front office talking to several other employees when she looked out the window and noticed a tall, dark-skinned woman walking around a car parked on a curb outside the building. She said that there was something about the situation that seemed out of place, but she assumed the woman was lost and did not investigate. Sherman also said the woman was fairly far away, and she was unable to identify the woman she saw that day.

---

[3] Sherman divorced sometime after the incident, and by the time she testified at trial she was using the surname Proyect. The credit cards at issue in this case, however, were issued in the name of Jodi Sherman, and we will refer to Proyect by her former name throughout this opinion.

At approximately the same time, a training session was being conducted in the cafeteria area of the building, which was located on the ground floor. The doors going into the cafeteria from outside had been left unlocked so that the caterers, who had not yet arrived, could enter to set up lunch. Part way through the session, several people noticed a tall, dark-skinned woman dressed in a bright printed dress and carrying a large handbag walk into the building through that door, which apparently made a distinctive sound when it opened. They did not recognize the woman as being a Primrose employee and did not think she was attending the training seminar. The witnesses said that the woman appeared somewhat startled that she had walked into a room full of people; she looked around and then turned and went through the doors that led into an area where employee offices are located.

Phyllis Thompson, Primrose's director of operations, was one of the people who saw the woman enter the building that day. She said it was very unusual for a visitor to enter through that door, so she approached the woman as she started walking toward the office area. Members of the public were not supposed to enter that area without permission, and Thompson knew that those offices were deserted at that particular time. The woman identified herself as a travel agent and gave Thompson a business card naming the person she said she was supposed to meet. Thompson did

not recognize the name but called the Primrose school, which was located nearby, to see if anyone by that name worked at that Primrose location. The school informed her that the name was unfamiliar, so she escorted the woman back out the door. Thompson said the woman was "kind of hasty to get out really quick," and because she assumed the woman was in a hurry to meet up with her client, she just opened the door and let her out.

Thompson and two other employees who saw the woman enter that morning were subsequently shown a photographic lineup containing Streeter's photograph. Only one of the employees was able to identify Streeter from the lineup, and he was also the only Primrose employee who identified Streeter at trial. However, Thompson and another Primrose employee testified that a wig found in Streeter's possession when she was arrested looked similar to the hair of the woman they saw that day, and the other Primrose employee identified the dress Streeter was wearing, which all the witnesses generally described as brightly patterned.

Later that evening, Sherman discovered that her wallet was missing from her purse, and she subsequently spoke to her credit card companies about the use of several of the credit cards that had been in her purse. At trial, the State presented video recordings and testimony that showed Streeter using credit cards the afternoon

5

of July 14 to make, or attempt to make, purchases at a Target, an AutoBuffs car wash, and a Walmart, all of which were located in close proximity to each other. The State also introduced receipts from the Target and Walmart showing that Streeter had used Sherman's BB&T card at those stores. The following day, Sherman's wallet, missing all of her credit cards except one that had not yet been activated, was found by workers at a car dealership located on Highway 92 in Acworth. And the State showed that the car dealership was located on a "straight line" between Streeter's house and the businesses where the cards were used.[4]

Other facts will be set forth as necessary to address Streeter's specific contentions on appeal.

1. Streeter first contends that her trial counsel was ineffective because he did not recall Thompson to the stand to testify after he learned that she had identified someone other than Streeter as the person she saw enter the Primrose building on July 14, 2011.

---

[4] Investigators discovered one of Sherman's credit cards had been used at the AutoBuffs, and it was when they were watching the video recording from that location that they saw the tag number of the car Streeter was driving and tracked her to her house. When officers went to Streeter's house, she was wearing the same dress she wore in the videos showing her using the credit cards at Target, Walmart, and AutoBuffs.

The record shows that after they had testified on the first day of trial, Thompson and another Primrose employee approached the prosecuting attorney and told him that a woman they had noticed sitting in the back of the courtroom, who was later identified as Streeter's daughter, strongly resembled the person they saw enter the Primrose offices that morning. The prosecuting attorney notified Streeter's trial counsel of this development, and the attorneys separately interviewed the witnesses before the trial resumed the next day. When questioned further, the other Primrose employee apparently equivocated about her identification of Streeter's daughter, but Thompson remained firm in identifying Streeter's daughter as the person she saw in the Primrose building.

Trial counsel testified concerning his decision not to recall the witness at the hearing on Streeter's motion for new trial. He said that when he spoke to Thompson again by phone during a subsequent trial recess, she told him that she could not positively identify Streeter as the person she saw in the Primrose building and that Streeter's daughter looked more like the person she saw. Trial counsel testified, however, that despite this potentially exculpatory testimony, he decided not to recall Thompson to the stand because he was uncertain what her testimony would be if she was recalled, especially when he learned that Streeter's daughter had been in Florida

7

at the time of the crime and thus could not have been the person Thompson saw in the building.[5] Further, trial counsel testified that he did not believe that Thompson's initial testimony was that harmful to the defense, since she did not identify Streeter as the person she saw in the building. And he thought her failure to identify Streeter would cast doubt on the credibility of the other witnesses because Thompson spent the most time observing the person who came in the Primrose building. To support Streeter's contention that trial counsel should have recalled the witness, Streeter's new counsel submitted Thompson's affidavit[6] in which she avers that after she saw the woman in the courtroom, she would have testified that Streeter was not the person she spoke to in the Primrose building the day of the theft.

> In order to prevail on her claim of ineffective assistance of counsel, Streeter
>
> must show counsel's performance was deficient and that the deficient performance prejudiced [her] to the point that a reasonable probability exists that, but for counsel's errors, the outcome of the trial would have been different. A strong presumption exists that counsel's conduct falls within the broad range of professional conduct.

---

[5] After this issue came to light, the State announced that it had subpoenaed Streeter's daughter and that she was in the courthouse ready to testify if necessary.

[6] Thompson's affidavit was submitted without objection at the motion for new trial hearing in lieu of her testimony.

(Citations and punctuation omitted.) *Pruitt v. State*, 282 Ga. 30, 34 (4) (644 SE2d 837) (2007). "A decision amounting to reasonable trial strategy does not constitute deficient performance. Instead, matters of trial tactics provide grounds to find counsel ineffective only if the tactical decision is so patently unreasonable that no competent attorney would have chosen it." (Citations and punctuation omitted.) *Gill v. State*, 295 Ga. 705, 708 (763 SE2d 719) (2014). Trial counsel's testimony at the motion for new trial hearing established that his reason for not recalling the witness was one of trial strategy and, under the circumstances, the reasons he gave for this strategy were not patently unreasonable. Although Streeter contends that trial counsel should have questioned the witness more extensively to alleviate his concerns about her testimony, Streeter has not shown how additional questioning of the witness would have led to a different decision in light of counsel's expressed belief that Thompson's failure to identify Streeter in her initial testimony helped the defense more than a later identification of someone who in all likelihood could not have committed the crime. Id.; *Collins v. State*, 300 Ga. App. 657, 659 (1) (686 SE2d 305) (2009).

2. Streeter also challenges the sufficiency of the evidence to support her burglary conviction, arguing that because the Primrose corporate offices were open to the public on the day she was alleged to have entered the building, the State failed

9

to show she entered the building "without authority." "In the context of our criminal code[, OCGA § 16-1-3 (18),] and as applied in burglary cases specifically, the term 'without authority' has been defined to mean 'without legal right or privilege or without permission of a person legally entitled to withhold the right.' [Cits.]" *State v. Newton*, 294 Ga. 767, 771 (755 SE2d 786) (2014).

Contrary to Streeter's argument on appeal, the evidence in this case does not show that the Primrose office building was open to the public during the training seminar in general or on the day of the incident in particular. Although on that day the locks were disengaged on some of the doors that were normally kept locked,[7] this was done only for the purpose of allowing Primrose employees attending the seminar and the caterers who were setting up lunch to enter the building. Thus, they had the legal right or privilege to enter without permission, and Streeter clearly did not fall into either category.

Further, even assuming the building was open to the public at the time Streeter entered the building,[8] her conviction for burglary was also proper based on her

---

[7] Although not crystal clear, it does not appear that the doors were actually ajar.

[8] OCGA § 16-7-1 has been amended to create gradations of first and second degree burglary, but that amendment applies only to offenses that occurred on or after July 1, 2012. Ga. L. 2012, p. 899, §§ 3-1, 9-1.

unauthorized entry into the office area of the building where Sherman's wallet was stolen. At the time the crimes were committed in this case, the crime of burglary was committed when "without authority and with the intent to commit a felony or theft therein, [a person] . . . enters or remains within . . . any building, . . . or any room or part thereof." OCGA § 16-7-1. And pursuant to the statute, the trial court charged the jury without objection on the definition of burglary as follows:

> A person commits the offense of burglary when without authority that person enters any building or dwelling place of another or into any room or any part of it with the intent to commit a theft. To constitute the offense of burglary it is not necessary that it be shown that a break in occurred or that an actual theft was accomplished.

Thus, even assuming the unlocked doors resulted in implied authority to enter the building, the evidence was clear that the Primrose employee offices which were located in the building were not that day, or any other day, open to the public. Further, the victim testified that she had a private office for her exclusive use, that members of the general public did not have access to the hallway where her office was located, and that no one was supposed to be in that area except for people who worked there or who had permission to be in the area from someone that worked in the building. Accordingly, the jury was authorized to conclude that Streeter was

11

without authority to enter Sherman's office at the time the theft was committed, and her conviction for burglary is affirmed. *O'Neal v. State*, 171 Ga. App. 582 (320 SE2d 612) (1984) ("evidence showed that appellant without authority rifled through areas and rooms which were not open to the public at any time, and this was burglary"); *Riley v. State*, 130 Ga. App. 181, 182 (202 SE2d 533) (1973) (under applicable statute, defendant charged with entering a certain building may be convicted of burglary upon proof that he entered a part of the building or one room of the building).

3. Lastly, Streeter argues that the evidence was insufficient to convict her of Count 2 of the indictment charging her with financial transaction card fraud based on her unauthorized use of Sherman's BB&T card to purchase a car wash at AutoBuffs.[9] We agree. Although the video recording showing Streeter using some type of financial transaction card to purchase the car wash was introduced and played for the jury at trial, and Sherman testified that Streeter did not have her permission to use her

---

[9] Count 2 charged that Streeter committed the offense of financial transaction card fraud when she, "with the intent to defraud Auto Buffs [sic] . . . did unlawfully obtain goods and services having value of less than $100.00 by presenting one BB&T Visa Card issued to Jodi Sherman, a financial transaction card, without the authorization and permission of Jodi Sherman, the cardholder, in violation of OCGA § 16-9-33. . . ."

BB&T card at AutoBuffs, no evidence was presented showing that Sherman's BB&T card was the card Streeter used to pay for the AutoBuffs transaction. The name of the card is not visible on the recording and, unlike the WalMart and Target transactions, a receipt for the AutoBuffs transaction was not introduced into evidence at trial. The investigating officer testified the card used there was the "card that was reported stolen," but the evidence showed that Sherman had several credit cards stolen from her wallet, and the officer could not recall the name of the card used at AutoBuffs, which he said was written in a case file he had left at his office. Accordingly, we agree that Streeter's conviction for financial transaction card fraud as alleged in Count 2 of the indictment must be reversed.

*Judgment affirmed in part and reversed in part. Phipps, C. J., and Ellington, P. J., concur.*